# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

CHARLES ALEXANDER BOWE,  )
                              )
     Movant,           )
                              )
v.                          )     Case No. CV408-033
                              )         (CR404-308)
UNITED STATES OF AMERICA,  )
                              )
     Respondent.     )

## REPORT AND RECOMMENDATION

Following his 2005 conviction for drug offenses, Charles Alexander Bowe unsuccessfully appealed, *United States v. Bowe*, 192 F. App'x 871 (11th Cir. 2006), *cert. denied*, 549 U.S. 1257 (2007), and now moves the Court for 28 U.S.C. § 2255 relief, for leave to conduct discovery, and to amend his § 2255 motion. Docs. 1, 12, 16.[1] Re-asserting many of the same issues, he also he moves under Fed. R. Crim. P. 33(b)(1) for a new trial based upon newly discovered evidence. Cr. doc. 165. The government opposes Bowe's motions. Docs. 10, 14, 18; cr. doc. 170. The Court should

---

[1] Unless otherwise noted, citations are to the docket in Bowe's civil case, CV408-033. "Cr. Doc." refers to documents filed under his criminal case, CR404-308.

deny relief on Bowe's § 2255 motion and related motions for discovery and to amend.   (His Rule 33(b)(1) motion is before the district judge.)

# I. BACKGROUND

Bowe's main § 2255 claim is that two of his four retained trial lawyers -- the two who defended him at trial; the other two provided only ancillary support -- provided him with ineffective assistance of counsel (IAC).  Doc. 4, 11.  That claim requires the Court to retrace his lawyers' litigation footsteps.

## A.  Procedural Background

The Eleventh Circuit summarized the procedural history of the case:

> On February 2, 2005, Bowe, Damian Coverley, and Omar Theophilus were charged in a superseding indictment with conspiracy to import cocaine, importation of cocaine, conspiracy to possess with intent to distribute cocaine, and possession with intent to distribute cocaine. After plea negotiations failed, Bowe was scheduled to proceed to trial on July 18, 2005. On July 14, 2005, Bowe moved to continue his trial date to complete his defense preparation. The motion was granted,[2] and the trial

---

[2] In doing so, the trial judge recounted Bowe's previous attempt to plead guilty:

On 7/13/05 the Court was informed that the defendant wished to go forward with his plea, but that he had employed new counsel. Edward Garland and Donald Samuel then entered an appearance on 7/14/05 requesting a continuance of trial. Garland and local counsel [Alexander] Zipperer both argued on Bowe's behalf, expressing criticism of [the] . . . trial preparation [by the original trial lawyer retained by Bowe, Brian

date was reset for August 1, 2005. [The judge also denied Bowe leave to take depositions. Cr. doc. 58 at 2 (concluding that Bowe had failed to meet the factors set forth in *United States v. Drogoul*, 1 F.3d 1546, 1553 (11th Cir. 1993))].

On the morning of trial, Bowe filed a second motion for a continuance. Bowe argued that the continuance was necessary to permit his counsel time to review extensive discovery material that was produced by the government on July 26, 2005. The district court denied the motion, and trial proceeded.

*Bowe*, 192 F. App'x at 873 (footnotes added). As the prosecution reached the end of its presentation on the first day of the two-day trial, the Court reminded defense counsel to have their witnesses ready for the following morning:

THE COURT: Okay. Let's start back at 8:30 in the morning. Is that all right?

---

Howard. They suggest that he focused his energies on obtaining a favorable plea bargain rather than preparing for trial. Bowe's current quartet of attorneys thus request additional time to investigate his case in the Bahamas, to depose foreign witnesses, and to obtain and review wiretaps of cooperating witnesses. Doc. # 56. Meanwhile, Bowe remains in jail.

Cr. doc. 58 at 1. The judge was

dismayed that counsel and the defendant did not alert [the Court] earlier of any criticism of Howard's work. Indeed, they represent that Howard is still assisting in the case. The Court must now wonder whether this late motion is not being used for *tactical advantages*.

*Id.* at 2 (emphasis added).

MR. HOWARD:  Judge, I just wanted to alert the Court to one potential problem we may have.  It is logistical.  You indicated we probably will need to be ready.  I didn't realize this trial was going to run like a freight train.  Now, we have witnesses under subpoena.  But they are all either in the Bahamas or Miami.

THE COURT:  Well, you've got the night's work. Your client has got planes, and he can have them here.  They've got three air services.

MR. HOWARD: Yes, Your Honor.

THE COURT: You can be the taxi service from the airport.

MR. HOWARD: They [the Bowe family] actually don't have them [i.e., planes] any more.  They have the fuel services.

THE COURT: Okay.  That is the reason we're having this, to get them on in.

MR. HOWARD: We have witnesses that will be but here [sic], I am expecting there is going to be a gap, because --

THE COURT: Well, there's *not going to be a gap*.  We are going to go.  That is the reason I try to keep you apprised.  It seems to me we always get through faster.  But anyway, see what you can do this evening.

MR. HOWARD: Yes, sir.

Cr. doc. 91 at 331-32 (emphasis added).  After calling five witnesses the next morning, Bowe's counsel again alerted the judge that defense witnesses were still en route to Court.  Counsel thus pleaded with the judge to take

an early lunch.  He refused.  Cr. doc. 92 at 376-79.  Witnesses Franz Bowe

and Theresa Laramore reached the courthouse at 2:30 p.m., just after trial

concluded.  Doc. 4, attach. 12 (F. Bowe decl.) ¶ 6; doc. 11, attach. (Second

F. Bowe decl.) at 1.

## B. Factual Background

The indictment alleged two conspiracies that occurred in 2001-02 and

2004.  Cr. doc. 28; *see also supra* note 3.  The government's case hinged on

the credibility of Damian Coverley, and to a substantially lesser extent

Robert Nylund.  Both had been arrested and secretly turned against Bowe.

Bowe underscores these facts in arguing how much he was prejudiced by his

counsel's failure to call various witnesses to impeach them.  The evidence

covers the two time periods.

### 1. *The 2001-2002 Period*

The Eleventh Circuit related the facts of the first conspiracy as

follows:

> At trial, the government presented evidence of a
> conspiracy between Bowe, Coverley, and Theophilus to import
> cocaine to the United States from the Bahamas.[3]  Coverley

---

[3] Bowe and his family own, in the Bahamas, Executive Flight Services (EFS), a
charter brokerage service, and an aircraft fueling service.  Cr. doc. 91 at 291-92, 299,

testified that he met Bowe in 2001 and began a relationship in which Bowe would provide money and Coverley would buy cocaine, import it to the United States, and sell it. Coverley then returned the proceeds to Bowe and was paid a fee.[4] Coverley testified that he and another conspirator usually used Bahamas Air or a cruise ship to import the drugs.

Coverley testified that, on one occasion, he and Bowe traveled to New York where they picked up seven or eight roller bags filled with cash. In New York, Coverley and Bowe met Kevin Frater, a friend of Bowe. Coverley testified that he and Bowe flew from New York to California with a stop in Kansas to refuel. Coverley testified that in California they swapped the money in the roller bags for cocaine and returned to New York, again stopping in Kansas for fuel. In New York, Frater met Coverley and Bowe at the airport, picked up the cocaine, left and returned in about an hour and a half. Coverley, Bowe, and

---

329; cr. doc. 92 at 395-97. Bowe was EFS's Operation Manager. Cr. doc. 91 at 329. He owned 15% of the family's businesses. Cr. doc. 92 at 415.

[4] As Coverley explained, Bowe gave money in 2001 to buy cocaine, for which Bowe paid Coverley a percentage of any resulting cocaine sales:

A. The first time [Bowe] had wire[d] $52,000 into a friend of mine's account in the Bahamas. I picked up the money from Omar Moore in the Bahamas, and I purchased four kilos of cocaine. Me and Omar transported it into Miami. [¶] I drove down to Tampa, sold the cocaine. I turned over like, I think it was between 80 and $90,000 cash to Mr. Bowe.

Q. And what did you get paid for it?

A. The first time I got about 3 or 4,000.

Q. So, he provided money to you?

A. Yes.

Cr. doc. 91 at 202.

Frater then returned to Miami. Bowe objected to this testimony on the ground that it was irrelevant and not within the charged conduct. The district court overruled the objection.

Coverley then testified regarding another drug transaction. He testified that, a short time later, a man named Austin Williams was stopped by drug enforcement agents in Kansas with 155 kilograms of cocaine when his plane stopped to refuel. Coverley testified that Williams tried to call Frater several times while Coverley, Bowe, and Frater were together. Coverley testified that he, Bowe, and Frater considered going to Kansas City to intercept the drugs but decided not to go because they were suspicious that Williams had been arrested. Frater then became nervous and decided he needed to leave the country. Coverley testified that he and Bowe took Frater to the airport where Frater left on one of Bowe's airplanes. Bowe did not object to Coverley's testimony.

*Bowe*, 192 F. App'x at 873-74 (footnotes added).

On the second day of trial, a [Drug Enforcement Administration (DEA)] agent testified about the seizure of drugs in Kansas that Coverley had described on the previous day. After receiving a tip, DEA agents searched a Falcon 20 business jet that was refueling in Salina, Kansas. The agents discovered six large roller suitcases packed with cocaine and arrested Williams, who was on the plane. Williams agreed to cooperate with the agents and identified Frater as a contact. Williams then called Frater numerous times at the direction of the DEA agents to arrange a pick up of the cocaine but was not able to make contact with Frater. Williams did not identify Bowe as a contact, although Bowe's number was listed in Williams's telephone. Bowe did not object to this testimony.

The last witness for the government was Robert Nylund, a pilot who had flown airplanes for the Bowe family business.

Nylund testified that, in December 2002, he flew Frater to Havana, Cuba. Nylund testified that Frater told him that Frater needed to leave the country because a friend had been arrested for drugs in Salina, Kansas, that he was scared, and that he could not go back. Bowe objected to this testimony as hearsay, but the district court overruled the objection as an exception under the coconspirator rule. Nylund testified that in July 2004 he began to work as an informant for the DEA. After he was approached by Coverley and Theophilus to transport drugs, Nylund contacted the DEA. On cross-examination, Nylund testified that Bowe had never asked him to transport drugs.

*Id.* at 874-75.

## 2. *The 2004 Period*

The evidence supporting the second conspiracy was outlined thusly:

Coverley [also] testified regarding a transaction in November and December of 2004. Coverley testified that in November 2004, Bowe gave him $56,000. Coverley then concealed the money and flew to the Bahamas on one of Bowe's planes. In the Bahamas, Coverley gave the money to Theophilus who purchased eight kilograms of cocaine. Theophilus then transported the cocaine, on a private airplane, to Savannah where Coverley was to meet him at the airport. Coverley then planned to sell the cocaine in South Carolina [to a man named "Dewey"] before returning the proceeds to Bowe. Coverley was intercepted by DEA agents before he could sell the cocaine in South Carolina.

Finally, Coverley testified about taped conversations he had with Bowe, after Coverley had been arrested and agreed to cooperate with the government. Coverley testified that in a conversation about auto parts, he and Bowe were actually discussing the quality and sale price of the cocaine that

Theophilus had purchased with the $56,000 fronted by Bowe. Coverley explained that "five parts" was five kilograms of cocaine and that a reference to some parts being "aftermarket" meant that the cocaine was not one hundred percent. Coverley explained that in other recorded conversations he and Bowe were trying to set up a time to meet for Coverley to give Bowe the money. The money was to be transferred at the Home Depot in Weston, Florida.

At the meeting to transfer the money, Coverley , who was still in the custody of the DEA, wore a recording device and a camera. Coverley testified that he and Bowe discussed the amount of money he received for the cocaine. Coverley then went to his car to retrieve a bag of money to give to Bowe. When Coverley went to Bowe's car with the bag, Bowe was arrested. [Bowe then consented to a search of his home, where agents seized $8,000 in cash, checks, a "crew coordinating conference" document bearing the names of "Charles Bowe, Kevin Frater, and other pilots," and, *inter alia*, a rolodex with Frater's name and number on it. Cr. doc. 91 at 287-294.] Coverley also testified that he entered a plea agreement with the United States and testified so that he might receive a lesser sentence.

*Id.*, 192 F. App'x at 874.

### 3. *Bowe's Defense*

After the government rested, Bowe moved to strike the testimony about the seizure of cocaine in Salina, Kansas, as evidence that was not an intrinsic part of the alleged conspiracy under Federal Rule of Evidence 404(b). Bowe also moved for a judgment of acquittal on each count and a continuance because many of his witnesses were not yet present. The district court

denied each motion[, and this ruling was affirmed on appeal].[5]

Bowe presented his defense. After calling several witnesses,[6] Bowe renewed his request for a continuance because

---

[5] On the continuance issue the Eleventh Circuit reasoned that Bowe "failed to demonstrate that his proffered witnesses would testify to any material issue or that he did not have adequate time to prepare a defense." *Bowe*, 192 F. App'x at 876. Bowe points to this ruling as evidence that his trial counsel were ineffective. Doc. 4 at 14-18; doc. 11 at 2 ("Mr. Bowe's instant [IAC] claim is based upon the very reasoning of the trial court and the appellate court to the effect that counsel did *not* properly proffer the testimony that the witnesses in question could have provided").

[6] Bowe called: (a) DEA Agent Robert Livingston, primarily to cross him about Livingston's pretrial call to Alfonso Bowe, which Bowe claimed was meant to intimidate Alfonso and thus all other defense witnesses (though he obviously did not succeed in intimidating Alfonso from testifying), cr. doc. 92 at 380-87, 446-59; (b) another DEA agent, primarily to clarify a discrepancy about the amount of cash seized from Bowe's home, *id.* at 387-93; (c) Alfonso Bowe, who testified about: the family businesses; the fact that there are no income or capital gains taxes in the Bahamas; that the family's business was successful so defendant had no economic need to distribute cocaine; that Coverley owed EFS a "mid-50,000" dollar debt for freight chartering through it; Allen Burrows, a Bahamian businessman with whom EFS does business; Alfonso's piloting credentials/experience; agent Livingston's threat to the defendant's girlfriend; and a Falcon jet's cargo-carrying limitations, *id.* at 393-440, 444-46; (d) Christine Bowe, to testify about: Coverley's debt for flight services and thus bolster Alfonso's testimony showing that Charles Bowe's dealings with Coverley were aimed not at drug distribution, but recovering, in cash, what Coverley owed him; and also about Allen Burrows, who did business with EFS but required that all matters shipped through him be accompanied by *receipts*; *id.* at 459-62; and (e) Diane Bowe Pindling, another sister of the defendant, who testified that she is a CPA, that her brother worked very hard for the family's companies, and that when she brought American-bought goods back to the Bahamas she had to supply Bahamian customs with *receipts*. *Id.* at 464-72.

Alfonzo, in that regard, testified that the nature of the Bowe family business required large amounts of cash transactions for legitimate business. Cr. doc. 92 at 393-446. He explained to the jury: "Many of our clients are not local. They are international clients. We've had many returned checks. And it is a nightmare to chase people down across the world. So, we actually promote and encourage the clients as much as they can to pay us in cash. Particularly there is a section of business that normally travels to Cuba, and without even requiring those people would pay cash." *Id.* at 425.

several witnesses had not arrived or refused to come to the United States from the Bahamas. Bowe proffered the testimony he expected each witness to give. The district court did not grant a continuance, and Bowe rested. Bowe also moved for a mistrial on the ground that he was not able to present a defense.[7] The court denied the motion. The jury found Bowe guilty of all charges.

*Bowe*, 192 F. App'x at 875 (footnotes added).

## II. ANALYSIS

Bowe argues that his trial counsel were ineffective because they failed to: (a) investigate/prepare/present his defense; (b) file a motion to suppress; and (c) seek a venue-based dismissal of the superseding indictment. He also argues that the government withheld exculpatory evidence. Docs. 4, 11.

---

[7] As part of those mistrial grounds, attorney Garland reminded the trial judge that the Court had denied the defense leave to take depositions. Cr. doc. 92 at 485.

> MR. GARLAND: So, I could not --- I mean that order [i.e., Cr. doc. 58 at 2] was clear. There was nothing I could do about taking depositions. And I stated it in my original motion that as a matter of due process and the ability to provide effective assistance and the right of defense that depositions need to be taken in the Bahamas, because people in the Bahamas were fearful of coming to the United States. And that has been further borne out by the tape recording of the conduct of the agent in this case. . . .

*Id.*; *see also* cr. doc. 92 at 382-83 (replaying for the jury DEA Agent Rob Livingston's intimidating, pretrial voice mail to Alfonso Bowe, who nevertheless testified at trial).

## A.   Ineffective Assistance of Counsel -- General Standards

Because Bowe's IAC claims were not available to him on direct appeal, they are not procedurally barred and thus may be reached here. *Massaro v. United States,* 538 U.S. 500, 504 (2003); *United States v. Merrill*, 513 F.3d 1293, 1308 (11th Cir. 2008).   But he must satisfy the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), by showing that counsel's performance was deficient and that such performance prejudiced Bowe's defense or sentencing.   *Id.* Courts have elaborated upon the two (performance and prejudice) parts of that test.   Hence,

> [t]he standard governing counsel's *performance* is "reasonableness under prevailing professional norms." *Id*. at 688, 104 S.Ct. at 2065. "We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately." *White v. Singletary*, 972 F.2d 1218, 1221 (11th Cir. 1992). The petitioner's burden to prove by a preponderance of the evidence that counsel's performance was unreasonable is a heavy one. *See Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (en banc). The petitioner must show that *"no competent counsel would have taken the action that his counsel did take."* *Id*. at 1315.

*Ford v. Hall*, 546 F.3d 1326, 1333 (11th Cir. 2008) (emphasis added). Courts evaluate the reasonableness of counsel's performance from counsel's perspective at the time of the alleged error and in light of all the

circumstances. *Strickland*, 466 U.S. at 690. Moreover,

> [i]t will generally be appropriate for a reviewing court to assess counsel's overall performance *throughout* the case in order to determine whether the identified acts or omissions overcome the presumption that a counsel rendered reasonable professional assistance. Since there are countless ways to provide effective assistance in any given case, unless consideration is given to counsel's overall performance, before and at trial, it will be all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.

*Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986) (quotes and cite omitted; emphasis added). The *Strickland* test is guided by additional considerations where a constitutionally deficient-investigation/presentation is alleged. In such a case

> the Court must first determine "whether a reasonable investigation should have uncovered . . . [the omitted, allegedly exonerating] evidence." *Middleton v. Dugger*, 849 F.2d 491, 493 (11th Cir.1988). "If so, then a determination must be made whether the failure to put this evidence before the jury was a tactical choice by trial counsel." *Id.* If so, such a choice must be given a strong presumption of correctness, and the inquiry is generally *at an end. Id.* (citing *Funchess v. Wainwright*, 772 F.2d 683, 689-90 (11th Cir.1985)). If, however, the failure to present the mitigating evidence was an *oversight,* and not a tactical decision, then a harmlessness review must be made to determine if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Middleton*, 849 F.2d at 493. Thus, it must be determined that Petitioner suffered actual prejudice

due to the ineffectiveness of his trial counsel before relief will be granted. *Id.*

*Byrd v. United States*, 2008 WL 4665991 at * 10 (M.D.Fla. Oct. 21, 2008) (unpublished) (emphasis added)[8]; *see also Pace v. McNeil*, 556 F.3d 1211, 1224 (11th Cir. 2009) (defense counsel's decision to limit his investigation is accorded a strong presumption of reasonableness). Fine-tuning this standard further, the Eleventh Circuit has stated that

> "[i]n general, defense counsel renders ineffective assistance when [he] fails to investigate adequately the *sole* strategy for a defense or to prepare evidence to support that defense." *Fortenberry v. Haley*, 297 F.3d 1213, 1226 (11th Cir.2002). Counsel's duty to investigate "requires that counsel 'conduct a substantial investigation into any of his client's plausible lines of defense.'" *Id.* (citation omitted). In evaluating counsel's investigation, we have held that "counsel need not always investigate before pursuing or not pursuing a line of defense. Investigation (even a nonexhaustive, preliminary investigation) is *not* required for counsel reasonably to decline to investigate a line of defense thoroughly." *Chandler*, 218 F.3d at 1318 (citing *Strickland*, 466 U.S. at 690-91, 104 S.Ct. at 2066).

*Michael v. Crosby*, 430 F.3d 1310, 1320-21 (11th Cir. 2005) (emphasis added), quoted in *United States v. Duncan*, 2007 WL 3119999 at * 9 (N.D.Fla. Oct. 24, 2007) (unpublished); *see also Blankenship v. Hall*, 542

---

[8] Strategic decisions made after a "less than complete investigation" must be based on reasonable professional judgments that support the particular level of investigation conducted. *Strickland*, 466 US at 690- 91.

F.3d 1253, 1273 (11th Cir. 2008) ("in evaluating the reasonableness of the investigation, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further") (quotes, cite, and alterations omitted).

Finally, § 2255 movants like Bowe must state "what information counsel would have uncovered if he had investigated, or how such information would have changed anything about movant's conviction or sentence." *Garvin v. United States*, 2006 WL 3254493 at * 7 (S.D.Ga. Nov. 8, 2006) (unpublished); *Henson v. United States*, 2007 WL 1655245 at * 4 (S.D.Ill. June 6, 2007) (unpublished) ("he must point to sufficiently precise information, that is, a comprehensive showing as to what the investigation would have produced") (quotes and cite omitted). That comports with *Strickland's* second (actual prejudice) prong, under which IAC claimants must show that counsel's errors had more than "some conceivable effect on the outcome of the proceeding." *Grayson v. Thompson*, 257 F.3d 1194, 1225 (11th Cir. 2001). In citing evidence that was available to his trial counsel but not presented at trial, then, Bowe must show a reasonable probability --

sufficient to undermine confidence in the outcome -- that the results would have been different but for counsel's deficient performance (i.e., had that missing evidence been presented). *Garvin,* 2006 WL 3254493 at * 3.[9]

## B. Specific IAC Claims

### 1. *Failure to Prepare/Present Bowe's Defense*

As the above factual recitation shows, the prosecution's case against Bowe pivoted on Coverley's testimony, and relied far secondarily on Nylund's. In fact, the case probably could not have been prosecuted without Coverley. Unsurprisingly, Bowe's extensive § 2255 briefing primarily focuses on his trial counsel's failure to exploit impeaching evidence against Coverley -- something that would have been consistent with trial counsel's primary trial strategy: to convince the jury that Bowe was not engaged in any drug trade but instead operated a legitimate, cash-oriented business, and that Coverley was merely spinning "snitch-

---

[9] *See also United States v. Hilliard*, 752 F.2d 578, 581 (11th Cir.1985) ("Appellant has failed to provide any examples of evidence that would have been introduced or new lines of defense that could have been pursued if her attorney had interviewed the government's witnesses"), quoted in *United States v. Scott*, 2008 WL 1776668 at * 3 (M.D.Fla. Apr. 16, 2008) (unpublished). In assessing such examples, courts examine whether it could said that no competent counsel would have done so. *Chandler,* 218 F.3d at 1315 ("petitioner must establish that no competent counsel would have taken the action that his counsel did take"); *DeCarlo v. United States*, 2008 WL 516169 at * 3 (S.D.Ga. Feb. 26, 2008) (unpublished).

fabrications" to mitigate his prison sentence. *See* Cr. doc. 92 at 509 (defense closing argument: "[The prosecution's] case rises and falls on the testimony of Damian Coverley , because without it they don't have a case.[10] And they are trying to dress him up and make him look good, and taking his word as gospel truth, when they know that he is a deceiver. He is a concealer. And he has every motive in the world, facing life imprisonment, to throw someone else under the bus") (footnote added); *see also* doc. 10 at 13 (government's § 2255 response brief) ("trial counsel contended that an untrustworthy Coverley owed money to the Bowe family for flight services stemming from Coverley 's auto parts business; Bowe tried to collect the money; and Coverley , 'trying to ensnare Bowe' and get the lowest sentence possible, implicated Bowe").

Bowe's IAC claims thus focus primarily on trial counsel's (especially

---

[10] Bowe contends that, had he been acquitted of the 2004 conspiracy, venue in this District would have failed and thus the whole prosecution would have failed. Doc. 4 at 19 (citing Fed. R. Crim. P. 18). Defects relating to venue, however, are waived unless raised prior to trial. *United States v. Greer*, 600 F.2d 468, 469 (5th Cir. 1979); *Kitchen v. United States*, 532 F.2d 445, 446 (5th Cir. 1976). "[V]enue is not a non-waivable jurisdictional requirement or one which the defendant can raise at any time," *Cagnina v. United States*, 223 F.2d 149, 154 (5th Cir. 1955), and thus a defendant has no right to assert a venue question "after the close of the evidence." *Harper v. United States*, 383 F.2d 795 (5th Cir. 1967). Further, "the government need only establish proper venue by a preponderance of the evidence, not by proof beyond a reasonable doubt." *United States v. Wuagneux*, 683 F.2d 1343, 1356-57 (11th Cir. 1982).

attorney Brian Howard's) failure to round up and present critical impeachment witnesses -- specifically his "failure to investigate <u>and/or</u> a failure to secure and present testimony <u>and/or</u> a failure to *timely* move to depose witnesses <u>and/or</u> a failure to *adequately proffer* the testimony of witnesses in support of the continuance motion and motion to depose." Doc. 11 at printed page 1 (CM/ECF screen page 6). Bowe insists that Howard spent too much time trying to negotiate a guilty plea and too little time investigating and preparing his defense. As time ran out, Bowe hired Edward Garland and Donald Samuel (*see* Cr. doc. 57) to help Howard,[11] but that was too little too late, and both Garland and Howard have admitted (Garland directly, Howard to an investigator, and to Garland) that the case had been under-prepared by the time it was brought the case to trial. Doc. 4, attach. 7 (McDaniel decl.) ¶¶ 27-33; attach 9 (Garland decl. ¶¶ 7, 8; doc. 11.

The parties have tendered lengthy briefings on this core ("under-

---

[11] Zipperer's role apparently was to act merely as local counsel and thus facilitate ministerial matters for out-of-town counsel. And Don Samuel did not appear in court for trial, so at most he worked from afar on the defense's behalf. No IAC allegations are raised against them. Thus, the IAC-focus here is on Howard and Garland, primarily Howard. (Garland is presented here as a highly competent lawyer who was dragged down by Howard's incompetence and thus did the best he could under the circumstances Howard created.)

preparedness") set of claims. Consistent with *Garvin* and cases like it, Bowe cites a series of uncalled witnesses to show, through 28 U.S.C. § 1746 declarations, how their testimony likely would have altered the outcome of his trial.[12] To that end, Bowe focuses the Court on uncalled-witness IAC cases like *Washington v. Smith*, 219 F.3d 620, 629-30 (7th Cir. 2000) (defense counsel rendered constitutionally deficient performance when he failed to produce critical alibi witness at trial, after having failed to contact witness prior to trial and waiting to subpoena her until two days before she was to testify, despite knowledge that she was hard to reach; counsel could not put the witness's convenience above his client's interests, and counsel's efforts to secure the witness did not demonstrate minimal diligence that effective counsel would have employed); *Brown v. Myers*, 137 F.3d 1154, 1156-57 (9th Cir. 1998) (no "dispute" that IAC performance prong was met

---

[12] Due to Howard's under-preparation, says Bowe, Garland was unable to offer affidavits to the Court in support of a continuance motion or a motion to depose these witnesses. Doc. 4 at 14; *see also* cr. doc. 56 at 2-3. Bowe complains that both Howard and Garland "repeatedly told the Bowe family that it would not be necessary to have any Bahamian witnesses at trial until the Wednesday evening of trial." Doc. 4 at 17. As the record (discussed *infra*) shows, the defense literally ran out of witnesses during trial because of this misstep, so they resorted to buying time with a "filler witness" because the trial judge refused to grant a continuance to accommodate witnesses then in-flight. Counsel performed ineffectively, argues Bowe, by failing to secure the attendance at trial (or failing to depose) the following witnesses: (1) Marvin Miller, (2) Phillip Miller, (3) Kary Davies, (4) Chigozie Ijeoma, (5) Omar Moore, (6) Omar Theophilus, (7) Troy Johnson, (8) Theresa Laramore, and (9) Franz Bowe. *Id.* at 19-29.

when counsel failed to investigate petitioner's alibi claim or present any alibi witnesses to corroborate his testimony); and *Hadley v. Groose*, 97 F.3d 1131, 1135 (8th Cir. 1996) (IAC claim upheld in a weak-prosecution case arising from counsel's failure to investigate and present defendant's alibi, and also impeach "footprint testimony" with contradicting police report). Doc. 4 at 12.

Most of the uncalled-witness testimony, unsurprisingly, goes to impeach Coverley by showing that (a) he lacked credibility; (b) he actually did deal in cash-in-trade-oriented goods like auto parts,[13] motorcycles, etc.; and (c) he never had any cash on him, let alone any from Bowe, in fact owed money to others, and had to be "fronted" drugs due to his lack of cash.

### a. OMAR THEOPHILUS

Bowe attacks Coverley 's testimony that he received $56,000 from Bowe, concealed the money and flew to the Bahamas, and gave the $56,000 to Bowe's co-defendant (and fugitive) Omar Theophilus to buy cocaine for Bowe. In doing so, Bowe contends that attorney Howard was ineffective for

---

[13] At trial Coverley testified that he was in the auto parts business and that he had shipped auto parts on one of Bowe's planes "[p]robably once or twice, and most of the time, I used to carry grocery and money." Cr. doc. 91 at 253.

failing to direct two amply funded pretrial investigators to seek out and interview Theophilus, who was living openly in the Bahamas at the time. Doc. 4 at 22-24 & McDaniel decl. at 3-4. Had Howard done so, Bowe contends that Theophilus would have provided to any defense lawyer or investigator who approached him, *id.* at 4 ¶ 14, the following information:

> (1) Theophilus had procured cocaine and paid Robert Nyland for the December 3, 2004 flight;
>
> (2) Coverley had owed Theophilus money and thus told Theophilus that if they worked together on a cocaine deal, Coverley would be able to pay Theophilus off;[14]
>
> (3) Coverley thus approached Theophilus in late October or early November 2004 to do a cocaine deal;
>
> (4) Coverley never said the money for the cocaine came from Bowe, and in fact Theophilus had serious reservations whether Coverley had *any* money;
>
> (5) when it came time to actually buy the cocaine, Coverley produced *no* money and thus the cocaine had to be "fronted" to him.

McDaniel decl. at 3-4 (paraphrased).

Such information -- if properly presented through testimony or,

---

[14] At trial, Coverley testified that he owed *Bowe* $206,000 from past cocaine transactions and that he trafficked cocaine for Bowe to work off that debt. Cr. doc. 91 at 251-52.

perhaps, a Fed. R. Crim. P. 15 deposition -- would have unquestionably constituted material impeachment evidence, for it calls into question Coverley 's assertion that he had obtained $56,000 from Bowe to give to Theophilus.[15] Right now, however, it is presented as "IAC evidence" of what Theophilus would have disclosed to attorney Howard's investigator if asked.[16]

All of it, however, comes to the Court through the declaration of Gary McDaniel, Bowe's § 2255 investigator. *See* McDaniel decl. at 3-4. And all of it is hearsay. Two sub-issues thus arise: (1) whether this evidence can be considered *at all* in a § 2255 proceeding; and (2) whether it would have been admitted at trial, which in turn figures into whether trial counsel were ineffective for failing to use it (for if they could not have used it then they were not ineffective for failing to investigate/present it).

Hearsay is not uniformly prohibited -- witness the various exceptions

---

[15] On cross at trial, Coverley wavered in response to questions whether Bowe or Theophilus "fronted" the cocaine that Coverley dealt. Cr. doc. 91 at 257-58.

[16] Bowe also cites it in support of his Rule 33(b)(1) new trial motion. Cr. docs. 165 at 8-10; 171 at 6-9.

to the hearsay rule[17] -- and in fact is sometimes permitted outright depending upon the hearing and forum:

> Despite the general rule of exclusion, hearsay is admissible at bail hearings, extradition proceedings, hearings on motions to suppress, preliminary hearings, and sentencing. Hearsay is also admissible at probation revocation hearings, at least where under the circumstances such evidence satisfies minimum due process standards. Hearsay may also be considered when issuing arrest and search warrants.

2 WHARTON'S CRIMINAL EVIDENCE § 6:4 (*Hearings at which otherwise inadmissible hearsay is admissible*) (15th ed. Nov. 2008) (footnotes omitted). Habeas proceedings, however, are *not* on that list. For that matter,

> [t]he Federal Rules of Evidence apply in 28 U.S.C.A. § 2255 proceedings to the extent that matters of evidence are not provided for in the statutes which govern procedure in such proceedings or in the 28 U.S.C.A. § 2255 Rules. Hearsay is *not* admissible at the hearing, unless an exception applies. . . .

16A FED. PROC., L. ED. § 41:550 (*Evidence*) (Sept. 2008) (emphasis added).

Can the Court consider the McDaniel declaration about what Theophilus said *at all*, even on a tentative basis? The rules governing § 2255 proceedings authorize the application of both the Federal Rules of

---

[17] The Federal Rules of Evidence apply to § 2255 proceedings, *see* Fed. R. Evid. 1101(e), so the hearsay exceptions contained in Fed. R. Evid. 803 likewise apply.

Civil and Criminal Procedure where doing so would not be inconsistent with any statutory provision or the § 2255 rules. Rule 12, Rules foll. 28 U.S.C. § 2255; *see also McBride v. Sharpe*, 25 F.3d 962, 969 (11th Cir. 1994) (authorizing use of Federal Rules of Civil Procedure where habeas rules supply no mechanism for resolving habeas claims); *Heath v. Jones*, 863 F.2d 815, 818 (11th Cir. 1989) (same); *Goodwin v. Johnson*, 132 F.3d 162, 182 n. 15 (5th Cir. 1997) (in concluding that 28 U.S.C. § 2254 petitioner was entitled to an evidentiary hearing, court pointed out that petitioner's "affidavit is competent summary judgment evidence that creates a genuine issue of material fact as to whether [he] refused a request by [the] police to waive his *Miranda* rights and subsequently invoked his Fifth Amendment right to counsel").

Hence, Fed. R. Civ. P. 56's "reducible-to-admission-at-trial" doctrine can be used in § 2255 proceedings. And that doctrine, of course, enables courts to consider hearsay in "tentatively hearsay" form (which is what affidavits attached to summary-judgment briefs essentially are), so long as the submitting party can also show that he can reduce it to admissible form at trial or at a hearing. Bowe thus must show that he could produce

Theophilus's testimony in admissible form. *See, e.g., McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996) (*Celotex* allows "otherwise admissible evidence to be submitted in inadmissible form at the summary judgment stage, though at trial it must be submitted in admissible form").

Habeas cases thus require, at the end of the day, admissible (non-hearsay) evidence. The initial presentation can be, as in ordinary summary judgment cases, in affidavit form, so long as it is evident that from the face of what is presented it can be reduced to admissible form at an evidentiary hearing. *See LoCascio v. United States*, 395 F.3d 51, 57 (2d Cir. 2005) (in determining whether § 2255 movant is entitled to an evidentiary hearing, the court looks "primarily to the affidavit or other evidence proffered in support of the application in order to determine whether, if the evidence should be offered at a hearing, it would be admissible proof entitling the petitioner to relief."); *United States v. Lowe*, 6 F. App'x 832, 837 n. 6 (10th Cir. 2001) ("In the event that Lowe decides to pursue this issue in a § 2255 motion, we advise him that hearsay affidavits may be disregarded. . . ."); *Hayden v. United States*, 814 F.2d 888, 892 (2nd Cir. 1987) (statements by codefendant and confidential informant as to what they were told by

another codefendant concerning alleged attempt to bribe jury were hearsay in nature and, when not confirmed by any of the witnesses who were deposed, were insufficient to warrant full evidentiary hearing in habeas corpus proceeding on issue of jury tampering notwithstanding that statements were brought forward by Government and used to obtain an anonymous jury in another case); *D'Andrea v. United States,* 2009 WL 248025 at * 3 (D.Conn. Feb 3, 2009) (unpublished). These cases turn on this core logic: "A standard that would entitle a petitioner, based solely on hearsay information . . . to a full evidentiary hearing . . . would too easily lend itself to abuse, because such hearsay is too easily manufactured." *Hayden*, 814 F.2d at 892.

Bowe cites as evidence admissible *right now* that portion of McDaniels's declaration bearing Theophilus's statement against penal interest. Doc. 4 at 24 (citing attach. 7 at 3-4 (Theophilus admitting that he and Coverley did cocaine deals together) and Fed. R. Evid. 804(b)(3)). Cr. doc. 165 at 9 n. 2. Alternatively, Bowe can reduce Theophilus's testimony down to admissible form through a Fed. R. Crim. P. 15 deposition, and in his new-trial motion he requests leave to take that deposition now. Cr. doc.

165 at 9 n. 3.

Presupposing that no such deposition will be taken, the government focuses on (and thus objects to) the Court's use of the McDaniel declaration alone at this juncture -- i.e., it contends that the Court cannot consider, on hearsay grounds, what Theophilus has said *as presented through* McDaniel's declaration. Doc. 10 at 47-48. The government argues that only the inculpatory portion of Theophilus's statement is admissible, not the part that exonerates Bowe. Doc. 10 at 47-48 (citing *United States v. Jernigan*, 341 F.3d 1273, 1288 (11th Cir. 2003) (denial of new trial, based on defendant's discovery, following his conviction for being felon in possession of firearm, of codefendant's jail-house admission that gun found between them in car seat was his, was not abuse of discretion; admission was hearsay, which probably was not admissible under exception for statements against penal interest, given absence of corroborating circumstances indicating trustworthiness). Also, the government further argues that the Theophilus statement favorable to Bowe constitutes a collateral matter unsupported by any independent evidence of its reliability. Doc. 10 at 48 (citing *Williamson v. United States,* 512 U.S. 594, 600 (1994)

(finding statement collateral to a self-inculpatory statement "says nothing at all about the collateral statement's reliability" and should be treated as any other hearsay statement)).[18]

Bowe counters that sufficient corroboration exists to consider the full Theophilus statement now: undercover tapes made in the Bahamas involving only Theophilus, Coverley, and Nylund (suggesting that since Bowe was never mentioned, he was never involved); Theophilus's statement that Coverley acquired drugs with fronted, not actual money, plus DEA agent K. Byrnes's corroborating belief on that score; the trial judge's comment that Coverley 's trial testimony about the finances never added up; and finally, the fact that Theophilus is still living openly and notoriously in the Bahamas with no DEA effort to get him extradited to the U.S. Doc. 11 at 23. Even were this "paper testimony" inadmissible at trial, Bowe continues, that only bolsters Bowe's IAC claim that effective counsel thus should have sought Theophilus's *deposition* testimony ahead of trial, for it is undeniably material (to the issue of Coverley 's credibility). *Id.* at

---

[18] The *Williamson* Court clarified that the exception to the hearsay rule for statements against penal interest does not allow admission of a nonself-inculpatory statements, even if they are made within broader narrative that is generally self-inculpatory. Only a narrow reading is permitted, to include only those remarks within a confession that are individually self-inculpatory. 512 U.S. at 600-01.

26.

Much of this multi-pronged argument goes unrebutted by the government. And arguably this is an issue that might benefit from resolution at an evidentiary hearing. For example, following the defendant's conviction in *United States v. Gates*, 10 F.3d 765 (11th Cir. 1993), a co-defendant, who had not testified at their joint trial, signed an affidavit listing those involved in the charged bank robberies and stating that Gates was not involved. *Id.* at 767 n. 1. The district court denied Gates's motion for a new trial without first conducting an evidentiary hearing. *Id.* at 768. The Eleventh Circuit acknowledged that post-trial exculpatory statements by convicted co-defendants must be viewed with caution but held that the district court erred in denying the defendant's motion without first conducting an evidentiary hearing. *Id.*

Here an *un*convicted co-defendant (Theophilus) has represented essentially the same, except that unlike in *Gates* it is not presented through an affidavit but instead undisputed hearsay. That fact (the pure hearsay nature of Theophilus's statements) distinguishes this case from *Gates* and the few other cases that have tolerated "iffy" collateral-proceeding evidence

to support an evidentiary-hearing grant.

Indeed, it cannot go unnoticed that Bowe, who is of ample financial means,[19] could have simply asked Theophilus to sign a § 2255 affidavit (since he claims Theophilus has been hiding in plain sight, doc. 4 attach 7 at 3), yet obviously did not (or, he did and Theophilus declined). And Bowe does not even suggest that Theophilus would travel to this jurisdiction and swear to such things under oath at an evidentiary hearing. For that matter, Bowe cites no authority for leave to grant depositions in the collateral relief phase of a case,[20] as opposed to during direct criminal proceedings.

It also is conspicuous that Bowe, whose § 2255 counsel certainly know how to file motions, has *not* formally moved for an evidentiary hearing in this case. (A formal motion is not necessary, yet not prohibited). Most importantly, Bowe has been free to obtain a Rule 56-worthy affidavit from Theophilus *without* leave of this Court, then attach it to his brief (as any civil litigant is free to do in a summary-judgment case). In fact, he has

---

[19] He retained a total of four lawyers for his trial and direct appeal, plus two more for his § 2255 and Rule 33 motions, plus he is now on his third private investigator.

[20] This motion is also before the district judge, incidentally. *See* Cr. doc 165 at 9 n. 3.

been free to do so for the past several years since Bowe's conviction. Yet, he has not. That omission speaks volumes.

Thus, the Court declines to consider the Theophilus evidence, and it is disregarded as incompetent hearsay. *See Munoz v. United States*, 2008 WL 2942861 at * 7 (E.D.N.Y. Jul. 28, 2008 (unpublished); *Miranda v. United States*, 2008 WL 2561990 at * 7 (E.D.N.Y. June 25, 2008) (unpublished), both cases citing the Second Circuit's "middle road" approach used in *Haouari v. United States*, 510 F.3d 350, 354 (2d Cir. 2007) (in order to warrant an evidentiary hearing in the district court on a first motion to vacate, the application must contain assertions of fact that the movant is in a position to establish by competent evidence; hearsay statements will not suffice).

Finally, the Court agrees with the government that the Bowe-exculpatory portion of Theophilus's statement cannot qualify as an admission against penal interest (for saying that another was not involved is not the same as saying oneself was involved). Hence, no evidentiary hearing is warranted here. *United States v. Aiello*, 814 F.2d 109, 113-14 (2d Cir.1987) ("Airy generalities, conclusory assertions and hearsay statements"

do not warrant an evidentiary hearing); *Daniels v. Hollins*, 2006 WL 47412, at * 8 (E.D.N.Y. Jan 9, 2006) ("Daniels has only presented hearsay evidence. Thus, because Daniels has not presented any competent evidence, the Court concludes that the state court's denial of his claim without an evidentiary hearing was not contrary to or an unreasonable application of clearly established Supreme Court law.").

### b. MARVIN MILLER

Bowe insists that his lawyers could and should have called Marvin Miller to the witness stand because he would have been a convincing rebuttal witness to the "2004" conspiracy evidence, particularly Coverley 's testimony that he concealed the $56,000 Bowe had given him in a DVD player and flew to the Bahamas on one of Bowe's planes. Cr. doc. 91 at 216. Bowe now points to Miller's declaration to show how effective counsel (i.e., one that took the time to actually prepare his defense rather than his guilty plea) would have used Miller's testimony at trial. Miller says that he helped load cargo onto the plane that day and he saw no DVD player. Doc. 4 attach. 13 (M. Miller decl.) ¶ 2. "The only thing that Coverley brought with him into the passenger compartment," Miller says, "was as an open attache.

I was able to see into the attache and it contained only papers and folders."

*Id.* ¶ 4. Miller related all of this to defense attorney Howard early in the

prosecution, and he insisted that "[t]here was simply no way that Coverley

could have taken $56,000 on that plane unless it was hidden on his body."

*Id.* ¶ 5. And, Miller asserts, he would have been "happy to come to Georgia

to testify," but Howard simply dropped the ball. *Id.* ¶ 6.[21]

The government correctly points out that this evidence does not

support a failure to *investigate* claim. In fact, Bowe himself avers that

Howard had this information in plenty of time to use it at trial. Doc. 4 at

20 (noting that Miller gave this information to Howard just after the

detention hearing in this case). Bowe thus agrees with the government on

this point. Doc. 4 at 1 (complaining of his counsel's "failure to investigate

<u>and/or</u> a failure to secure and present testimony. . . .").

His complaint, however, focuses on his defense lawyers' failure to

timely *get* Miller to trial in time to use him (or take his deposition). Hence,

he raises a failure-to-present claim. And he reminds the Court that

---

[21] Bowe additionally emphasizes that it was crucial to his defense to negate the
2004 conspiracy count because that established venue in this District. Doc. 4 at 19. *But
see* n. 12 *supra.*

Coverley was not vague about how he transported the cash, testifying that he bought and converted a DVD player expressly for the purpose of transporting the $56,000. *See* Cr. doc. 91 at 216. The Court agrees that Miller's testimony, claiming he saw Coverley with *no* DVD player on the plane, cannot be dismissed as baseless.

The *Washington v. Smith* court, before granting IAC-based habeas relief on an uncalled-witness claim in that case, noted that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." 219 F.3d at 633. Here the prosecution's evidence was not weak, but neither was it overwhelming.[22] Indeed, the venue-based count turned almost entirely on the testimony of Coverley, who was "working off a federal beef," as the

---

[22] The government's case was certainly not insubstantial, however. Following his arrest upon receiving 8 kilograms of cocaine flown into Savannah aboard a private plane piloted by Robert Nylund, Coverley identified Bowe as the financier of the drug importation scheme and cooperated with the agents in making numerous recorded conversations with Bowe. Cr. doc. 91 at 143-45, 151-55. These conversations, Coverley explained, involved certain code terms for the cocaine transaction, including the number of kilograms involved and the proceeds received from the sale. *Id.* at 224-44. At the agents' behest, Coverley also engaged in a face-to-face meeting with Bowe at a Home Depot parking lot in Weston, Florida to make a controlled delivery of the cash proceeds. *Id.* at 238-45. During that meeting (secretly recorded by the agents), Bowe and Coverley discuss "the 8" and the fact that 3 of "the 8" were no good (which Coverley offered as an explanation for receiving only "90" for the sale). *Id.* at 239. This was powerful corroborative evidence linking Bowe to the 8 kilograms of cocaine which Nylund had imported and delivered to Coverley.

saying goes. So evidence suggesting that even a small part of his testimony was fabricated or in some way false may have, in the minds of at least some jurors, cast some doubt upon the rest of what he said.

For that matter, much of agent Livingston's testimony was predicated on Coverley's, so discrediting Coverley would have negatively impacted Livingston's own testimony. This (Marvin Miller) evidence thus does offer some support to Bowe's IAC claim. Yet even assuming it was unreasonable to fail to present this testimony, it is at best of dubious materiality for the simple reason that a rational jury would be free to dismiss it outright. There was no proffered testimony, for example, that ruled out Coverley having secreted the DVD player aboard the plane, for neither Miller nor any other uncalled witness ever says that they never took their eyes off Coverley at the time he boarded the plane. Conversely, there is no proffered § 2255 testimony to the effect that Coverley and the plane were thoroughly inspected and in a manner which would have detected the DVD player. Therefore, this evidence -- while not weightless -- simply does not rise to the level that warrants IAC-based relief on these grounds.

Bowe also points to additional § 2255 evidence from Miller, this time

involving witness Nylund.  Miller affirms that he is

> familiar with Robert Nylund [the DEA-informant pilot] and, in
> fact, Nylund has previously offered me a job.  Nylund and I had
> occasion to discuss the charges against Charles Bowe on several
> occasions. On many of those occasions he told me that, to his
> knowledge, Charles Bowe was never part of financing or
> purchasing the drugs that he (Nylund) flew to Savannah.  On at
> least one occasion, Nylund told me that he told this to the DEA
> agents involved in Charles' prosecution.

M. Miller decl. ¶ 7.

Nylund, it will be recalled, was also a government informant, but

Bowe does not show how this hearsay evidence[23] could have been admitted

---

[23] Normally,

> [h]earsay is "any out-of-court statement introduced in evidence for the
> purpose of proving the truth of the matter contained in the statement."
> *United States v. Williamson*, 450 F.2d 585, 589 (5th Cir.1971). A statement
> is not hearsay if it is offered against a party and is the party's own
> statement. Fed.R.Evid. 801(d)(2); [*United States v. Thompson*, 130 F.3d
> 676, 683 n. 7 (5th Cir.1997)] ("Hearsay problems are not a concern if the
> jury believes that the defendant was one of the participants in the
> conversation; any statements he made would be admissible as a statement
> of a party opponent."). An informant's statements are not hearsay and may
> be admissible when they are "part of a reciprocal and integrated
> conversation" with the defendant. *United States v. Cheramie*, 51 F.3d 538,
> 541 (5th Cir.1995). In *Cheramie*, an informant's statements to the
> defendant in a recording were admitted as nonhearsay when the jury was
> instructed that the informant's statements were admitted for the purpose
> of providing context for the defendant's statements and not for the truth
> of what the informant asserted. *Id.*

*U.S. v. Chaney*, 299 F. App'x 447, 452 (5th Cir. 2008), *cert. denied*, 129 S.Ct. 1651 (2009).
Here Miller cannot be said to have engaged with Nylund in a conversation that may be
said to be "'part of a reciprocal and integrated conversation' with the defendant." *Id.*

at trial. *See United States v. Green*, 556 F.3d 151, 155-58 (3rd Cir. 2009) (confidential informant's statement purporting to recount details of narcotics transaction was not admissible under present-sense impression hearsay exception, where statement was made more than 50 minutes after transaction, and only after informant was searched and driven to DEA offices, and expressly asked to reflect upon events in question by DEA agents). Thus, even if it can be said that counsel was deficient for failing to secure Miller's testimony at trial, it cannot be said that they were "*Strickland*-deficient" for failing to secure *this* rebuttal testimony.

### c. PHILLIP MILLER

Phillip Miller "was the pilot of the [$56,000] flight in question." Doc. 4 attach. 14 (Phillip Miller decl.) ¶ 2. He "can state unequivocally that the only baggage Coverley took on this flight was an open attache type briefcase. I would have been able to see if Coverley had a DVD player in his possession and he did not." *Id.* ¶ 4. And the government does not challenge Bowe's showing that his counsel had plenty of time to bring this witness to

---

Instead, he spoke with an *informant*. Hence, this testimony would not have been admitted at trial (for it is entirely reasonable to assume that the prosecution would have successfully objected on hearsay grounds).

trial and so testify.  This testimony, too, tends to support Bowe's IAC claim but is not sufficient to surmount the prejudice prong here, because it does not rule out Coverley 's pre-boarding actions nor affirmatively state that the briefcase could not have contained the DVD player camouflaged by something else.

### d. CHRISTINE BOWE

Bolstering his impeachment of Coverley 's $56,000-flight testimony, Bowe points to that portion of it that implies that Bowe -- in furtherance of the conspiracy -- arranged to fly Coverley on one of Bowe's planes.  Cr. doc. 91 at 216 ("Later on, I called Mr. Bowe. . . .  And he gave me a ride like around 8 or 9:00 o'clock that night on his plane").  Bowe maintains that both the Millers as well as Bowe's sister, Christine Bowe, "could have put the lie to Coverley 's claim that, hidden money aside, Charles Bowe was the one who arranged for Coverley to be on this flight to the Bahamas."  Doc. 4 at 21.  Marvin Miller would have testified that Coverley's *uncle* approached *Miller* about Coverley's "catch[ing] a ride on the flight." M.Miller decl. ¶ 3. And Bowe himself *opposed* Coverley riding on the plane because Coverley was in arrears to the Bowe family business for legitimate

business.  *Id.*  Bowe, in fact, left the decision up to Christine and the pilot. *Id.*

To that end, Christine Bowe, who *did* testify, says that she would have corroborated this assertion if asked to so testify.  C. Bowe decl. ¶ 2 ("had I declined, [Coverley and his uncle, Roy Davis] would not have flown with us").  So would Phil Miller.  P. Miller decl. ¶ 3 ("Charles Bowe never directed us to fly Coverley").  As with the Millers' testimony above, the government has not rebutted this evidence, which is not compelling but nevertheless does support Bowe's impeach-Coverley -based defense.  At most, however, this would be true to a marginally incremental degree, and thus is not sufficient to carry Bowe's prejudice showing here.

### e.  KARY DAVIS AND OMAR MOORE

Bowe next insists that, had Kary Davis and Omar Moore been timely subpoenaed or deposed, they could have rebutted Coverley 's "$52,000" testimony against Bowe.  Doc. 4 at 24-26.  To reiterate,  Coverley claimed that he and Bowe got involved in distributing cocaine in late 2001 or early 2002.  He related Bowe's funding of their first (circa 2001) cocaine purchase, when Bowe gave Coverley a percentage of the sale:

A.  The first time [Bowe] had wire[d] $52,000 into a friend of mine's account in the Bahamas.  I picked up the money from Omar Moore in the Bahamas, and I purchased four kilos of cocaine.  Me and Omar transported it into Miami. [¶] I drove down to Tampa, sold the cocaine.  I turned over like, I think it was between 80 and $90,000 cash to Mr. Bowe.

Q.  And what did you get paid for it?

A.  The first time I got about 3 or 4,000.

Q.  So, he provided money to you?

A.  Yes.

Cr. doc. 91 at 202; *see also id.* at 278 ("Q.  Okay.  Now, you said you were given money, your first time, $56,000?  A. [$]52,000 the first time. It was a wire transfer to Omar Moore's account").  Omar Moore and Omar Theophilus would then transport the cocaine from the Bahamas into the United States via airline and cruise ship.  *Id.* at 206-07.  Coverley engaged in these transactions with Bowe "[s]ometimes twice a month, and sometimes once every other month.  It depends on when I got the funds from him to do it."  *Id.* at 206.

Calling Coverley a "pathological liar," Moore declares that all of Coverley's "allegations are absolutely false."  Doc. 4, Moore decl. ¶ 2.  The $52,000 was for the purchase and sale of a BMW.  Moore "is a part-time car

broker. [He] had obtained the BMW, but it turned out to be a salvaged car with which the purchaser was not satisfied. Therefore, the $52,000 was being returned." Moore, however, never says that Bowe or one of Bowe's companies sold (through Moore) the salvage BMW for $52,000 and thus Bowe was merely wiring cash to Moore for the purpose of refunding $52,000 to the BMW's buyer. Thus, this evidence only partially supports Bowe's IAC claim (that Moore would have taken the stand and claimed Coverley was a liar, and denied any cocaine-sale involvement, etc., so counsel were ineffective for failing to present Moore as a defense witness), and does not add enough here to put Bowe over the IAC-prejudice line.

Bowe also cites additional, Coverley -impeaching information from § 2255 witness Kary Davis. This is presented, however, through Bowe's § 2255 investigator's Declaration. Doc. 4 at 25 (where the investigator opines that Davis would have testified that Coverley 's claim that Bowe transferred cash to Kary Davis for cocaine in fact went for things like golf carts and a motorcycle, and that Davis's account was used because Coverley was unable to get his own bank account).[24] This leads to the same hearsay and § 2255

_____

[24] Some corroborating evidence, however, exists. On cross-examination, Coverley conceded that Davis was his friend and that "Chigozie [Ijeoma] had wired some money

41

evidentiary issues discussed above, and thus is rejected on those same grounds.

Bowe also tenders the declaration of Bowe company accountant Chigozie Ijeoma, who says he "was aware of all wire transfers made from Charles Bowe to Kary Davis. Most [was] to purchase golf carts . . . . [and] ... [a]nother transfer was so that Coverley could purchase a . . . motorcycle for [Ijeoma]. Because of Damian Coverley 's connection with the auto and auto parts [trade], he had connections to obtain these items." Doc. 4, (Ijeoma decl.).

As is the case with several of Bowe's other § 2255 witnesses, Ijeoma says he would have appeared and testified if called by defense counsel during Bowe's trial. *Id.*

The Court likewise finds this evidence insufficient to meet the prejudice showing required by *Strickland*. For starters, any rational jury would have focused on the fact that Ijeoma is a Bowe *employee* (hence, his credibility was subject to swift dismissal by some if not all of the jurors).

---

for some golf carts to Kerry Davis before." Cr. 91 at 272. That is not enough, however, because it is not connected to any particular time points and transactions set forth in the government's evidence in this case, and does not otherwise constitute compelling evidence such that no rational jury could conclude that Bowe engaged in illegal (as opposed to 100% purely conventional business) transactions.

More critically, a basic "so what?" response would leap first in the minds of the jurors; it in fact would be quite ordinary for a drug smuggler to conduct legitimate business transactions in cash to provide cover for illegitimate ones. Indeed, Coverley himself testified on cross that he was in the auto parts business and air-shipped parts to his father and elsewhere in the Bahamas. Cr. doc. 91 at 252-53.

### f. TROY JOHNSON, FRANZ BOWE, AND T. LARAMORE

Bowe also attacks the government's "Kevin Frater" evidence against him. At trial Coverley testified that Frater, once alarmed that the authorities might be after him, "left out of West Palm Beach[, Florida,] and he flew into the Bahamas. And from the Bahamas, Robert Nylund took him to Cuba." Cr. 91 at 213. Coverley said he and Bowe drove Frater to the airport where "we put him on one of Mr. Bowe's planes." *Id.* at 214; *see also id.* ("We had [driven] to the airport in West Palm Beach where we met Mr. Frater. And we put him on the Turbo Commander, one [of Bowe's] planes, and one of his pilots flew him, out of the country").[25] Such evidence

---

[25] Pilot Robert Nylund testified that he flew Frater to Cuba after being asked by defendant Charles Bowe's brother, Franz Bowe. Cr. 92 at 361. But Franz Bowe, in his § 2255 declaration, denies the "being asked" portion of Nylund's testimony. Frater, he says, simply walked up to him "at the desk of [Bowe family business] Executive Flight Services in Nassau, Bahamas and requested a charter flight to Jamaica. [Franz

went to show that Bowe, to further the conspiracy to import, possess and distribute cocaine, assisted a co-conspirator (Frater) in evading law enforcement.

Prior to trial, attorney Howard received DEA reports relating Coverley 's claim that Bowe helped Frater flee the United States to the Bahamas following Austin Williams's arrest. Doc. 4 at 26. Coverley had evidently told the DEA that Bowe used a pilot named "Troy" to accomplish this. *Id.* at 26-27. Then Bowe used Robert Nylund[26] to fly Frater to Cuba. *Id.* at 27. And Coverley also had related a specific plane identification number to the DEA. Doc. 3 (Jan. 20, 2005 DEA Report at 3).

Bowe now says that he told attorney Howard, long before trial, that he knew only one pilot named "Troy"and that was Troy Johnson. C. Bowe Dec. ¶ 5. Howard, however, never contacted Johnson, who would have

---

informed Frater that the one plane we had available had already been chartered by a casino to take individuals to Havana, Cuba and that it was leaving in approximately one hour. He apparently made arrangements directly with individuals who were on that flight to pay them personally in order to accompany them to Cuba." Doc. 4, attach. 12 (F. Bowe decl.) ¶ 3. EFS's service representative, Theresa Laramore, corroborates this account. Doc. 4, attach. 12 (Laramore decl.) ¶¶ 1-3. And Franz, it will be recalled, showed up too late to testify at the trial in this case -- because Howard did not instruct him to appear earlier. (F. Bowe decl.) ¶ 6. Laramore also showed up just after trial ended. Doc. 11 (2nd F. Bowe decl.) at 1.

[26] Coverley testified that Bowe regularly used Nylund as a pilot. Cr. 91 at 207-08.

testified that he *never* flew Frater nor the "Turbo Commander" plane identified by Coverley as used for such transport. Doc. 4, (T. Johnson decl.) ¶ 3. Nor did he ever fly a plane bearing the ID number Coverley related. *Id.* And, he would have confirmed that he was the only "Troy" who worked for the Bowes. *Id.*

This § 2255 evidence at best marginally furthers Bowe's IAC claim because Coverley 's *trial* testimony never mentioned any particular pilot's name, though in theory Coverley , on cross, possibly could have been confronted by such contradictions (between what he told the DEA and Troy Johnson's assertions). Yet, that evidence may well have been excluded upon the prosecutor's objection on collateral-impeachment grounds. So it is only *somewhat* material that Johnson was not the West Palm Beach pilot that day, and not material enough to make a prejudice-prong showing here.

The same marginality could be said for the specific model aircraft used (i.e., that it could not have been, according to Johnson, a "Turbo Commander" model), as that could reasonably be dismissed as an innocuous misreading of the plane model, if not a simple memory blip. It therefore cannot be said that no competent lawyer would have failed to

call Troy Johnson to the stand here.

Franz Bowe and Theresa Laramore, in contrast, would have provided material testimony as set forth *supra* note 26. A minimally competent attorney following Howard's trial strategy (which was to show that Coverley was a liar and all of Bowe's actions could be explained as legitimate business purposed) would have at least made a reasonable attempt to present them as witnesses. However, Franz is a relative (one of Bowe's brothers) and Laramore was a Bowe company employee, so the jury would not have found them as credible and persuasive as an unrelated witness. Thus, even when considered in cumulation with the other omitted evidence, such omission cannot be said to place Bowe over the line here.

### g. THE PRETRIAL INVESTIGATORS

Summing up the foregoing § 2255 evidence, Bowe argues that attorney Howard's investigation "was pitiful and, ultimately, Edward Garland was forced to rely upon such a pitiful investigation to defend Mr. Bowe at trial." Doc. 4 at 28. Bowe had given Howard money to hire an investigator, C. Bowe decl. ¶ 13, yet Howard directed the investigator to do only a few hours work and to not even bother traveling to the Bahamas,

where key defense witnesses could have been found. (That investigator even inquired of Howard mid-stream and yet never heard further from him until after the trial, when Howard requested that he refund unearned investigation fees.) Doc. 4 at 28-29; McGuiness decl. ¶¶ 1-6 & attached June 13, 2005 letter; McDaniel decl. (relating results of a 400+ hour § 2255-phase investigation that involved, *inter alia*, contacting multiple Bahamian witnesses, including Theophilus, who revealed that he has been living openly in the Bahamas since December, 2004 and would have told any lawyer or investigator who approached him that Bowe was not involved in the 2004 transaction for which Bowe has been convicted).

Scrambling after the aborted guilty-plea attempt, Howard hired (in July 2005), a "last-minute" investigator, Frank Murphy. Murphy interviewed some witnesses and took photos of an auto parts store owned by Coverley 's father. He gave Howard a report but Howard never asked him to speak to any other witnesses in the Bahamas. Doc. 4, F. Murphy decl. ¶¶ 2-4. Nor did anyone ask him to secure the attendance of any witnesses for trial or assist in that effort. *Id.* ¶ 6.

Worse, Howard waited until "Monday evening, following the first day

of trial," to tell Bowe's family "that any witnesses we wanted needed to be in Savannah the next morning."  Doc. 4, Diane Bowe-Pindling decl. ¶ 3.[27] Howard was "frantic" and had short-timed the Bowes, who were unable to comply.  "When the witnesses did not arrive Tuesday morning, [Diane] was told that [she] would be called as a witness simply to 'f[i]ll time.'" *Id.* ¶ 4. And Howard, meanwhile, was supposed to "fall on the [IAC] sword" regarding the defense's lack of preparation.  *Id.* ¶ 6.[28]  Bowe now concludes

_____

[27]  This comports with the above-excerpted colloquy that Howard had with the trial judge, who refused to accommodate Howard based on the judge's erroneous belief that the Bowe family owned aircraft that could be summoned for overnight transport.

[28]  Again, this declarant is relating hearsay, though the government does not object, and Howard more or less conceded gross oversight at trial, when he ran out of witnesses. *See* Cr. 92 at 472-86.  He stalled in seeking depositions, he claimed, in order to curry the government's favor on the guilty plea that he had long-anticipated from Bowe, *id.* at 476-77 (explaining that he did not want to make the prosecutor "jump through hoops" in order to win guilty-plea concessions, and thus spare him, "dragging them down to the Bahamas to do depos.  At that point [i.e., when Bowe failed to plead guilty], having not done all of that [i.e., Howard's having failed to move for and take Rule 15 depositions], having [just] a week to get that [i.e., trial preparation done, including the depositions] just was not feasible.  And that was a delicate matter.").

And, Howard also explained, he did not want to inconvenience out-of-state witnesses by having them come to trial too early, so he gave them only 24 hour notices based on his (mistaken) belief that the government would take a full two days to put on its evidence (instead, it took one day and one hour). *Id.* at 481.  Franz Bowe says that he arrived at the courthouse at 2:30 p.m. (too late) on that second day of trial, even though defense counsel told him that he did not need to arrive until the following morning at the earliest.  Doc. 4, F. Bowe decl. ¶¶ 4, 6.

Howard's concern for witness convenience evidenced professionally misplaced priorities, which is why Bowe now appropriately cites *Washington,* 219 F.3d at 629-30 (defense counsel rendered constitutionally deficient performance when he failed to

that he "would have received better representation from a court appointed attorney."  Doc. 4 at 29-30.

## C.  Applying § 2255 -- Failure to Investigate/Present

Much of the government's opposition presumes that Howard is alleged to be ineffective for failing to *investigate* the above-described, "omitted witnesses."  Doc. 10 at 13-33.  Bowe emphasizes, however, that his "claim is based upon the very reasoning of the trial court and the appellate court to the effect that counsel did *not* properly proffer the testimony that the witnesses in question could have provided."  Doc. 11 at 2.  He contends that Howard -- despite however he mishandled and misguided his pretrial investigators -- knew of enough material defense testimony before trial yet *mishandled* it.  And he did so *not* out of any apparent strategy but through his own procrastination and incompetence, which included his underestimation of the trial's pace and misplaced priorities (not wanting to put the prosecutor "through the hoops" nor inconvenience witnesses).  For

---

produce critical alibi witness at trial, after having failed to contact witness prior to trial and waiting to subpoena her until two days before she was to testify, despite knowledge that she was hard to reach; counsel could not put the witness's convenience above his client's interests, and counsel's efforts to secure the witness did not demonstrate minimal diligence that effective counsel would have employed).

example, he simply waited too long to seek depositions[29] and was under-informed and unprepared when he made his deposition proffers which, due to such incompetence and carelessness, were legally deficient.  He also

---

[29]    Fed. R. Crim. P. 15 ("Depositions") "is silent on when a motion for a deposition is to be made. It should be made promptly, and a motion for a deposition that will delay the trial may be rejected as untimely." WRIGHT & MILLER, 2 FED. PRAC. & PROC. CRIM.3D § 242 (*Depositions*) (2008).  As one court recently summarized:

> Although Rule 15 is silent on when a motion for a deposition is to be made, courts have rejected as untimely motions that will delay the trial. Yet, the cases that have denied a Rule 15 motion as untimely stress that the party seeking the deposition made the request too close to the start of trial, rather than emphasizing that too much time has elapsed since the return of the indictment. *See, e.g., United States v. Dearden*, 546 F.2d 622, 625 (5th Cir.1977) (holding that trial court did not abuse its discretion when it denied a defendant's Rule 15 motion that was filed three weeks into trial); *United States v. Broker*, 246 F.2d 328, 329 (2d Cir.1957) (affirming district court's denial of a Rule 15 motion filed on the eve of trial when circumstances strongly suggested that "motion was only a dilatory tactic").

*United States v. Jefferson,* 594 F.Supp.2d 655, 673 (E.D.Va. 2009) (cite omitted).  However, there is authority for denying such a motion if it is filed beyond a court's deadline for filing pretrial motions and counsel knew about the witness yet delayed.  *United States v. Aggarwal*, 17 F.3d 737, 742 (5th Cir. 1994) (no abuse of discretion in denying, on basis of unexcused delay, defendant's motion to depose unavailable witness, even though motion was filed one month before case finally went to trial on its third setting; motion was made a month after court's deadline for pretrial motions, and there was evidence that defendant knew of witness and how to contact him much earlier).

Here the Court directed Bowe to file all pretrial motions within 20 days of his arraignment, Cr. doc. 18, 34, and Bowe was arraigned on the superseding indictment on February 24, 2005.  Cr. Feb.24, 2005 docket entry.  Bowe did not file his continuance/deposition motion until July 14, 2005.  Doc. 56.  Thus, it was untimely and just two weeks ahead of the already once-continued, August 1, 2005 trial. (Again, Bowe points to this as additional evidence that his lawyers were ineffective.)  Note that there is no set procedure for making such a deposition motion.  It can be made orally -- by counsel in open court -- rather than by affidavit. *United States v. Farfan-Carreon*, 935 F.2d 678, 679-680 (5th Cir. 1991).  Thus, no onerous procedural impedance existed here.

erroneously told witnesses willing to travel to the trial that they could arrive later than when actually needed (thus, the misplaced priority for witness convenience over his client's defense needs). *Id.* at 2-3.

These allegations are supported by the record. For that matter, the government does not dispute that, upon a showing of adequate cause, one may depose extra-jurisdiction witnesses for a criminal trial -- even if the deponent is a fugitive. *United States v. Ramos*, 45 F.3d 1519, 1523-24 (11th Cir. 1995) (in event it was determined that witness located in Colombia had material exculpatory information, trial court could *not* deny permission to depose witness on grounds there were countervailing factors sufficient to bar deposition; while it was unclear that deposition could be taken and deposing suspected drug dealer at place and time arranged by undisclosed third party in Medellin, Colombia, might pose threat to safety of attending prosecutor, there were United States government officials who could attend deposition to ensure safety or deposition could be accomplished through written interrogatories); *Farfan-Carreon*, 935 F.2d at 680 (defendant demonstrated requisite "exceptional circumstances" to require deposition of unavailable witness; witness was Mexican national beyond subpoena

power of court, his probable testimony was material to drug charges against defendant since it bore upon defendant's knowledge of hidden contents of truck, and it was unlikely that witness would return voluntarily given Government's threat to prosecute him if he entered country), cited in *United States v. Drogoul*, 1 F.3d 1546, 1553 (11th Cir. 1993); *United States v. Mills*, 760 F.2d 1116, 1120 (11th Cir. 1985) (district court's adoption of absolute rule that deposition of a fugitive would be an injustice was not harmless error on ground that evidence of guilt was overwhelming as jury might have concluded that fugitive's testimony was no more suspect than that of the convicted felons who testified for the Government and reviewing court could not determine whether defendant proffered insufficient evidence to justify an order for depositions);[30] *see also* cr. doc. 58 at 2; ANN.,

---

[30] The Eleventh Circuit is reasonably flexible here:

The moving party may demonstrate the probable unavailability of a prospective deponent through affidavits or otherwise. Significantly, that showing need not be conclusive before a deposition can be taken. It would be unreasonable and undesirable to require the government to assert with certainty that a witness will be unavailable for trial months ahead of time, simply to obtain authorization to take his deposition. A more concrete showing of unavailability, of course, may be required at the time of trial before a deposition will be admitted in evidence. *See* Fed.R.Crim.P. 15(e). A potential witness is unavailable for purposes of Rule 15(a), however, whenever a substantial likelihood exists that the proposed deponent will not testify at trial. In that situation, justice usually will be served by allowing the moving party to take the deposition, thereby preserving the

*Sufficiency of showing of grounds for admission of deposition in criminal case*, 44 A.L.R.2d 768.

Nor is there any dispute that Bowe was required to move for such depositions by March 16, 2005, *see* cr. doc. 34, yet filed no such motion until four months later. Doc. 56. There is no apparent "strategy" for this, nor does the government cite one. And the fact that, for example, Theophilus was an unapprehended co-defendant did not preclude a defense showing of sufficient cause for his deposition. *See Jefferson*, 594 F.Supp.2d at 671-72 (the status of the witnesses as unindicted co-conspirators does not represent a sound basis for denying defendant's request for a deposition in a criminal case; while there are legitimate concerns that the prospective deponents might commit perjury with impunity when giving testimony by deposition abroad, the jury is fully competent to take such concerns into account when weighing the credibility of their testimony); *see also id.* at 672-73 (foreign witnesses' refusal to be deposed voluntarily did not represent a sufficient

---

party's ability to utilize the testimony at trial, if necessary.

*Drogoul*, 1 F.3d at 1553 (quotes, cites and alterations omitted), cited by the district judge in this case. Cr. doc. 58 at 2. In *Mills*, incidentally, a Bahamian defendant won an appellate remand for a hearing on his new-trial motion based on his trial counsel's alleged ineffectiveness for failing "to investigate and present an alibi defense." 760 F.2d at 1121.

ground to deny defendant's motion for deposition in criminal case where mechanism existed to compel their depositions through letters rogatory procedure).

Since no "strategy" is cited, the Court will presume that Bowe meets the performance prong and thus examine the evidence under the prejudice-prong. *See Middleton*, 849 F.2d at 493 (if the helpful evidence was omitted by oversight, and *not* a tactical decision, then a harmlessness review must be made to determine if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different); *Byrd,* 2008 WL 4665991 at * 10. To that end, the Court will use the *Jefferson* court's "testimonial forecast" analysis in retroactive fashion here. *See Jefferson*, 594 F.Supp.2d at 667-68 (determining whether forecasted testimony is exculpatory, as required to establish the extraordinary circumstances needed to justify a deposition in a criminal case, involves identifying the elements of the crime, outlining the forecasted testimony, and comparing the elements and the forecasted testimony to ascertain whether the forecasted testimony negates any element of the charged crime or establishes a defense; then, if a prospective deponent's

forecasted testimony would be exculpatory, it is necessary to consider whether it is cumulative of other existing and available evidence).

Employing that method, the Court concludes that Bowe has not made a § 2255-actionable IAC showing. The Court reiterates here its evaluation of the § 2255 proffer for each uncalled witness above. Note, too, something that the trial judge suspected (articulated while denying Bowe's second motion for a continuance and his untimely motion for leave to take depositions) that tugs at judicial review here: What if Bowe's well-presented § 2255 motion is all part of an overarching strategy? *See* doc. 58 at 2 ("The Court must now wonder whether this late motion is not being used for tactical advantages"). What if trial counsel realized that the expected yield from then-contacted defense witnesses (including most if not all of the § 2255 witnesses presented here) would not suffice, so it made sense to stage a last minute "defense-lawyer-fumble" to create an IAC-based, second-bite (new trial) option via § 2255?

It cannot go unnoticed, in that regard, that a §2255 witness who speaks through affidavits or declarations, can feel far more comfortable signing their names to (often lawyer-prepared) documents than facing the

crucible of cross-examination at trial (or via pretrial deposition). And, as the government points out, "there is no way of knowing what inducements might have prompted" two Bahamanian-residents' statements. Cr. doc. 170 at 20. The record therefore does not entitle Bowe to an evidentiary hearing, and Bowe's witness-investigation/preparation/presentation-based IAC claims otherwise fail.

## D. Other IAC Claims

### 1. *Failure to Move to Suppress Evidence*

Trial counsel were also ineffective, Bowe contends, for failing to move to suppress items seized from Bowe's home and used against him at trial. Doc. 4 at 36-38. He agrees that, when he was arrested he consented to the *search* of his home, but not the *seizure* of some of its contents. Doc. 4 at Those contents included $8,000 in cash, a computer bearing a "contacts list" with Coverley and Frater's names on it, and documents showing a professional connection between Bowe, Frater, and Austin Williams. Doc. 4 at 36; doc. 11 at 28-30; *see also* Cr. doc. 92 at 288-312.

Both sides rely on the same core case, *United States v. Smith*, 459 F.3d 1276, 1290-91 (11th Cir. 2006) (the "plain view" doctrine permits a

warrantless seizure where (1) an officer is lawfully located in the place from which the seized object could be plainly viewed and has a lawful right of access to the object itself, and (2) the incriminating character of the item is immediately apparent), *cert. denied*, 549 U.S. 1137 (2007). In *Smith*, officers had search-warrant authority to search for drugs, including "photographs that would be probative to establish residency," when they opened a lockbox found to contain numerous photographs, some of which depicted defendant having sex with "very, very young girls" and resulted in his prosecution for production and possession of child pornography. *Id.* at 1281, 1291-93. Here Bowe does not dispute that he gave DEA agents consent to search his home, and he cites *United States v. Andracek*, 2007 WL 1575355 at * 7 (E.D.Wis. 2007) (unpublished) to support his consent to search/seize distinction. Doc. 4 at 36-37.

One commentator has illuminated examples of where consent has been found to start and stop:

> [I]t has been held that a consent to search for stolen office equipment does not permit the police to check the serial number on a television set, that a consent to search for a fugitive does not authorize the police to search bags and containers which could not conceal a person, that consent to "look around" a house does not authorize search into containers, and that

consent to enter to conduct questioning permits no search at all. On the same theory, it has been correctly held that police authority to search ceases as soon as they find the object they said they wanted to look for when they solicited the consent, and that where a defendant's consent is predicated explicitly on an understanding that the search will be brief, an extended detention sometimes exceeds the scope of the consent.

WAYNE R. LaFAVE, 4 SEARCH & SEIZURE § 8.1 (4th ed. 2008) (footnotes omitted). In no part of LaFave's discussion of case law, however, is there any mention of the consent-to-search-but-not-seize distinction underscored by Bowe here. And Bowe does not claim that he orally restricted the scope of the search to which he consented. Indeed, his § 2255 declaration is silent on this point.

Under the plain view doctrine, where law enforcement officers are given unrestricted consent to *search* a home, they necessarily have the right to *seize* what they reasonably believe to be evidence of a crime. *Smith*, 459 F.3d at 1290, 1291. Thus, agents who are given consent to search the home of a just-arrested suspect believed to be a major importer and distributor of drugs would quite naturally view large amounts of cash found lying about the house, as well as documents connecting the suspect to pilots and

aircraft, as items having evidentiary value. [31]

It cannot be said, under the objective standard set forth *supra*, that

---

[31] *Andracek*, for that mater, is distinguishable. There the defendant (also pursued on child porn charges) gave *written* consent which did not expressly authorize the physical seizure of his home computer:

> There is no legal support for the government's position that Andracek's signed consent to the search of his computer also authorized the . . . agents to remove the computer from the residence and take it to [a computer-specialist] officer in order to complete their search. Although Andracek's consent to have his computer searched necessarily included consent to some degree of a seizure of his computer, *see United States v. Jacobsen*, 466 U.S. 109, 113 (1984) ("A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property."), it is clear that Andracek's consent to any seizure of his property was so limited. The consent form is quite explicit that it is limited to a search; in fact the words "seize," "seizure," or any similar words are not used in the form. Thus, the only seizure authorized would be that which is inherently necessary to effect that search. In this case, based upon the text of the form and Andracek's discussions with the agents prior to SSA Hanson recognizing that she lacked a necessary piece of equipment, it is clear that Andracek's consent was limited to an examination of his computer in his apartment. Thus, if Andracek consented to the seizure and removal of his computer, such consent must be found elsewhere than the signed consent form or the verbal consent he offered prior to SSA Hanson's realization that she lacked a necessary piece of equipment.

2007 WL 1575355 at * 6. That court, incidentally, later determined that the defendant gave oral consent to the seizure. *Id.* at * 7-9. This Court, by the way, finds that court's reasoning crabbed at best (whether consent to search is oral or in writing, it is natural to conclude that consent to search implies consent to seize -- why else would one typically search something?). Therefore, the Court does not find *Andracek* persuasive.

In any event, here Bowe concedes that he gave oral consent *after* he was aware that he had been arrested for cocaine distribution, and he does not claim that he articulated any express limitations to that consent. Under the totality of the circumstances, it was reasonable to construe his consent as encompassing both a search and seizure of any drug-trade related evidence.

trial counsel here were *"Strickland*-deficient" for failing to litigate this reasonably exotic (i.e., not a "bread and butter") suppression issue. *Cf.* *Jones v. United States,* 2009 WL 454131 at * 5-6 (S.D.Ga. Feb. 23, 2009) (unpublished) (counsel ruled ineffective for missing a "bread and butter" suppression issue). This is particularly true since the suppression claim is clearly meritless, for agents given consent to search may seize any contraband or evidence of a crime they encounter during that lawful search. This IAC claim, then, also fails.

### 2. *"Venue Entrapment"*

Bowe also faults his lawyers for failing to move this Court to dismiss this case on a "venue-entrapment" theory, by suggesting that the government manipulated defendant into committing a crime in a venue he otherwise would not have chosen.[32] Doc. 1 at 7; doc. 4 at 38-39; doc. 11 at

---

[32] As explained elsewhere:

The concept of "manufactured venue" or "venue entrapment" stems from a footnote in *U.S. v. Meyers,* 692 F.2d 823, 847 n. 21 (2d Cir.1982) where the court left open the possibility of invalidating venue where the "key events occur in one district, but the prosecution, preferring trial elsewhere, lures a defendant to a distant district for some minor event simply to establish venue." *Id.* (*citing United States v. Archer,* 486 F.2d 670, 682 (2d Cir.1973) (holding that government agents cannot manufacture federal jurisdiction )). *But see U.S. v. Rommy,* No. 06-0520-CR, 2007 WL 3243813, at *16 (2d Cir.2007) ("In the quarter century since Meyers, this court has never vacated a conviction on the basis of manufactured venue.")

30-31. Bowe emphasizes that Nylund, acting as the government's agent, chose to fly the drugs attributable to Bowe to Savannah. Doc. 11 at 31. As the government points out, doc. 10 at 55-57, the Eleventh Circuit has not even recognized this as a valid defense and other circuits have rejected it. But just because the issue has been left open in this circuit, Bowe contends, does not mean that no competent lawyer would have failed to raise it. Doc. 11 at 30.

Venue is proper in any district where an overt act was committed in furtherance of the charged conspiracy. *United States v. Dabbs*, 134 F.3d 1071, 1078 (11th Cir. 1998). The *Dabbs* court "decline[d] to address the Fourth Circuit's decision in *United States v. Al-Talib*, 55 F.3d 923 (4th Cir.1995), which refused to recognize a theory of "manufactured venue" or "venue entrapment." *Dabbs*, 134 F.3d at 179 n. 10. The *Al-Talib* court noted that

> there are limits on the government's ability to "entrap" persons into crimes. Entrapment rules have no applicability to venue, however. The purpose of entrapment doctrine is to ensure that the government does not "implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission." Such substantive concerns of criminal law bear

_____

*United States v. Shutts*, 2007 WL 4287666 at\* 3 (S.D.Fla. Dec. 5, 2007) (unpublished).

little relationship to a procedural concept such as venue.

*Al-Talib*, 55 F.3d at 929 (cites omitted); *accord United States v. Bolden*, 305 F. App'x 83, 84 (4th Cir. 2008).  Despite its dubiousness, perhaps some lawyers would have raised this defense.  But it cannot be said that *no* competent counsel would have failed to do so, and that is the standard that must be applied (and that Bowe fails to meet) here.  Hence, this IAC claim also fails.

### E. *Brady* Claim

At trial Bowe sought to capitalize on "rogue agent" Robert Livingston's actions toward Alfonso Bowe.  In fact, Bowe called Livingston to the stand and ultimately played a telephone voice-mail tape of Livingston threatening Alfonso (as Livingston believed Alfonso was misusing government-issued discovery from this case to intimidate pro-government witnesses, cr. doc. 92 at 385):

> Alfonso, this is Rob Livingston.  Give  me  a  call if you get a chance, (912) 210-2170.  I want  to  talk  to  you about your running  around  the  Bahamas  can  trying  to  intimidate our witnesses.  I hope you enjoy your little  fucking third world country  over  there,  because  life  is going [to get] pretty uncomfortable for you if you try to come  to  the states.

Cr. doc. 92 at 382-83, 385.

The trial judge urged that Livingston be "severely reprimanded" for this conduct. *Id.* at 387. Bowe now cites to this misbehavior[33] and other, similar misbehavior, *see* doc. 4 at 32-33 (reproducing an intimidating Livingston call to the defendant's girlfriend), as background context to the following other, *Brady*-violating misconduct that Bowe alleges in support of § 2255 relief:

- Livingston asked Dudley Coverley (father of the government's star witness, Damian Coverley ) to contact Theophilus and tell him that the government was not interested in him but simply sought his cooperation against Bowe;

- Dudley Coverley also told Ijeoma that the "DEA wanted [Dudley] to convince [Theophilus] to implicate Charles Bowe in drug dealing;"

- nevertheless when Dudley contacted Theophilus, Theophilus told him that Bowe was *not* involved in drug dealings with Damian Coverley ;

- such exculpatory and impeaching information was never provided to the defense.

Doc. 4 at 33-34 (citing Ijeoma decl. ¶ 1 and McDaniel decl. at 5); doc. 11 at 26-28. Bowe contends that, because Theophilus's exculpatory statements

---

[33] No doubt defense lawyers and investigators, Bowe emphasizes, would be prosecuted for obstruction of justice or witness intimidation had they done the same. Doc. 4 at 33 (citing 18 U.S.C. § 1512). The government does not dispute this.

must have been known to Livingston (he demands § 2255 discovery to prove this if the government denies it), they should have been timely disclosed but were not, so this constitutes a *Brady* violation.[34] *Id.* Bowe argues that since the government's case turned so indispensably upon Coverley's testimony, the jury may well have reached a different result had they heard -- if only through Theophilus's deposition -- testimony from Theophilus *negating* Coverley's claim that Bowe was involved in the Coverley/Theophilus cocaine transactions. Doc. 4 at 33-35. Further, defense counsel could have

---

[34] Bowes does not cite to *Brady v. Maryland*, 373 U.S. 83 (1963), but stakes a claim under it. One supports a *Brady* claim with evidence that: (1) the prosecution possessed evidence favorable to defendant, because it was either exculpatory or impeaching, yet did not disclose it to the defense; or (2) the prosecution suppressed evidence such that the defense did not otherwise possess evidence and could not reasonably have obtained it; and (3) the evidence was material, and its absence yielded prejudice. *Gary v. Hall*, 558 F.3d 1229, 1255 (11th Cir. 2009). "Evidence is material so as to establish prejudice only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quotes and cite omitted); *see also United States v. Rafferty*, 296 F. App'x 788, 795-96 (11th Cir. 2008) (Government's suppression of allegedly exculpatory *Brady* evidence of interview with third-party bank account holder, explaining that most funds passing through account benefitted someone besides defendant, did not deprive him of due process at his trial for conspiracy to commit securities fraud, conspiracy to commit mail fraud and wire fraud, and two counts of wire fraud by diverting investors' funds, since there was no real probability of different outcome of trial if evidence had been admitted in defendant's favor, due to remaining witnesses and other evidence before jury to support defendant's fraudulent funneling of funds to other accounts); *United States v. Jordan*, 316 F.3d 1215, 1224-25 (11th Cir. 2003) (*Giglio* requires the prosecution to turn over to the defense evidence in its possession or control which could impeach the credibility of an important prosecution witness).

pounded this fact in front of the jury while illuminating the government's conspicuous failure to seek Theophilus's extradition -- i.e., the defense could have pointed to that fact while arguing to the jury that the government balked because it did not want the jury to hear Theophilus reveal that Bowe was not involved.[35] Doc. 11 at 28-29.

For that matter, Bowe further contends, Livingston was subject to the instant prosecutor's authority. *See United States v. Spagnoulo*, 960 F.2d 990, 994 (11th Cir. 1992) (*Brady* requirement that government possess the exculpatory evidence can be satisfied if evidence was in possession of prosecutor or anyone over whom prosecutor had authority); *accord United States v. Bolen*, 285 F. App'x 655, 659 (11th Cir. 2008). Finally, Bowe concludes, such information would have bolstered a defense motion to take Theophilus's deposition. Doc. 11 at 27.

The government's response addresses some of these arguments but skims over the rest. Doc. 10 at 42-50.[36] Still, Bowe's § 2255 evidence on

---

[35] *See* "Extradition Treaty, Dec. 22, 1931, U.S.-Gr. Brit., art. 7, 47 Stat. 2122, 2124 (1932), adopted by the Commonwealth of the Bahamas on its independence from the United Kingdom," *United States v. Bowe*, 221 F.3d 1183, 1191 n. 9 (11th Cir. 2000).

[36] For example, the government spilled a lot of ink insisting that Theophilus's statements, as related through another, would have been inadmissible at trial, and then baldly concludes that Theophilus -- a fugitive -- would not have testified at trial. Doc.

this claim presents the same hearsay issue as noted *supra*, and thus grinds down to the same result.

Bowe additionally complains that Livingston perjured himself during trial. Livingston cited, as justification for his "third world" phone call to Alfonso Bowe, his belief that defendant Bowe had somehow transmitted discovery materials from the government to his brother Alfonso, who then exploited the material to intimidate Bahamian-based, pro-prosecution witnesses. Doc. 4 at 33; *see also* cr. doc. 92 at 384-86 (Livingston's trial testimony confirming this). Bowe now maintains that it was *Livingston*

---

10 at 46-47. Of course, that simply ignores the deposition option. *See Jefferson*, 594 F.Supp.2d at 671-72 (the status of the witnesses as unindicted co-conspirators does not represent a sound basis for denying defendant's request for a deposition in a criminal case; while there are legitimate concerns that the prospective deponents might commit perjury with impunity when giving testimony by deposition abroad, the jury is fully competent to take such concerns into account when weighing the credibility of their testimony); *see also id*. at 675-76 (judicial assistance was warranted, on defendant's motion to depose witnesses in Nigeria, who were unindicted co-conspirators subject to prosecution in United States and who could provide material testimony but had refused to be deposed voluntarily either in United States or in Nigeria, to determine, by examination on basis of written interrogatories, whether witnesses would waive Fifth Amendment and testify fully in deposition and whether they would be willing to come to United States and testify at defendant's trial at defendant's expense, given that defendant already had failed in his efforts to receive such assurances).

The government also fails to meaningfully address Bowe's IAC claim that his trial counsel were ineffective for failing to timely move for Theophilus's deposition. It cannot reasonably be said that a jury would dismiss out of hand a co-defendant's "I did it, he didn't" claim. That sort of testimony is not common, and again, it cannot be denied that the government's case more or less hinged on a "snitch" who sought to curry favor with the government and sentencing judge.

who "made the contents of DEA-6 reports to Dudley Coverley , father of Damian Coverley, and his wife in order to solicit Dudley Coverley's cooperation with the DEA." *See* doc. 4 at 33 & McDaniel decl. ¶ 22. Again, even though the government fails to dispute or rebut this with a Livingston affidavit (but instead resorts to speculation, doc. 10 at 43 n. 10), nevertheless Bowe relies on inadmissible hearsay-based evidence. Hence, this claim is also denied.

### F.  Motions to Amend § 2255 Motion, for a New Trial, and for § 2255 Discovery

Bowe contends that the government withheld tape recordings made in or about April of 2004 in which Coverley arranged to purchase drugs from one Keith Major, Jr., who has since been prosecuted in a Florida federal district court. Bowe says his § 2255 investigator, after much effort, recently discovered this evidence in Major's case, and from those taped Coverley/Major conversations it is apparent that Coverley was part of a larger drug-distribution ring and not the sole minion of Bowe, as the government sought to portray him in this case. Cr. docs. 165, 171. And in none of the Coverley/Major discussions, where Coverley is alleged to have revealed his drug-smuggling partners, is Bowe's name even mentioned.

Doc. 165 at 4.

Bowe thus seeks leave to amend his § 2255 motion on the *Brady* grounds, alternatively on the IAC grounds to the extent that his trial lawyers should have uncovered and exploited this evidence for his defense. Doc. 13, 16 (citing 28 U.S.C. § 2255(f)(4) and Fed. R. Civ. P. 15(c)). He also seeks leave to serve a Fed. R. Civ. P. 34 subpoena upon the DEA requiring production of the Coverley/Major tapes and any related reports. Doc. 12 at 2 ¶ 3. Bowe insists that he meets the discovery requirements of Rule 6, Rules foll. 28 U.S.C. § 2255.[37] Alternatively, he seeks in camera review of the tapes by this Court. Doc. 12 at 3.

Conceding that this claim is not untimely and in fact does relate back,

---

[37] Unlike the usual civil litigant in federal court, Bowe is not entitled to discovery as a matter of course. *Wellons v. Hall*, 554 F.3d 923, 925 (11th Cir. 2009) (Rule 6(a) provides that "[a] party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." Rule 6(a). One shows such "good cause" for discovery by making specific allegations that show reason to believe that, if the facts are fully developed, one will be able to demonstrate entitlement to habeas relief. *Wellons*, 554 FF.3d at 925. The tapes cited here arguably supply good cause because it is certainly not an outlandish assumption that Coverley may well have said something to Major which could constitute exonerating or impeaching evidence that, if Livingston and thus the government are found to have (even imputed) knowledge of same, rises to *Brady/Giglio* (hence, disclosable) evidence. *Cf. Gates*, 10 F.3d at 768 (Defendant was entitled to hearing on motion for new trial based on affidavit of convicted codefendant, exculpating defendant and describing the robberies as involving other coparticipants).

the government asserts that Bowe cites nothing to charge Livingston with knowledge of the Coverley/Major tapes. Doc. 18 at 4. "Instead, Bowe attempts to impute knowledge of the Middle District of Florida case involving Major to the prosecutor and agent in the Southern District of Georgia." *Id.* Relying on *United States v. Meros,* 866 F.2d 1304, 1309 (11th Cir. 1989) (prosecutor has no duty to undertake fishing expedition in other jurisdictions in effort to find potentially impeaching evidence every time criminal defendant makes *Brady* request for information regarding Government witness; requirement that information be in possession of Government limits application of *Brady* to evidence possessed by district's "prosecution team"); *see also* GA. CRIMINAL TRIAL PRACTICE § 14-34 (*Discovery--Brady motion--Information known only to police*) (Dec. 2008), the government's local prosecutor denies knowledge of the Coverley/Major tapes, as does Livingston himself, so the government insists that it did not violate *Brady*. Doc. 18 at 6; cr. doc. 170-2 (Livingston affidavit).

This area of law is somewhat unsettled,[38] and Bowe has supplied

---

[38] As one encylopedist points out:

Other courts have . . . held, in a variety of contexts, that information maintained by cooperating entities falls within the scope of the government's *Brady* obligation. *See, e.g., U.S. v. Auten*, 632 F.2d 478, 481

evidence making Livingston's knowledge a fact issue, *see* cr. doc. 165 at 6-7 (former DEA agent/expert witness opining that no responsible DEA agent would have failed to run Coverley's name through the DEA's computer system to uncover the Coverley/Scott recordings); doc. 171 at 4-5 (pointing out that the government refuses to produce DEA-6 reports of the Coverley /Scott conversations).

However, the Court agrees with the government that there is

---

(5th Cir. 1980) (government has duty to seek out "information readily available to it" such as information regarding witness' criminal record); *Martinez v. Wainwright*, 621 F.2d 184, 186-87 (5th Cir. 1980) (finding *Brady* violation where state prosecutor was unaware that the FBI rap sheet was in the possession of a state medical examiner); *U.S. v. Deutsch*, 475 F.2d 55 (5th Cir. 1973) (*overruled on other grounds by, U.S. v. Henry*, 749 F.2d 203 (5th Cir. 1984)) (government had duty under *Brady* to obtain exculpatory information in possession of the United States Postal Service). *See also U.S. v. Wood*, 57 F.3d 733, 737 (9th Cir. 1995) (holding that once the Food and Drug Administration "consulted with the prosecutor in the steps leading to the prosecution the FDA is to be considered as part of the prosecution in determining what information must be made available to the defendant" and the government "cannot with its right hand say it has nothing while its left hand holds what is of value"); *U.S. v. Perdomo*, 929 F.2d 967, 970-71 (3d Cir. 1991) (prosecutor's duty to investigate witness' potential criminal record required prosecutor to check Virgin Islands and not just NCIC database). *See generally Moon v. Head*, 285 F.3d 1301, 1309 (11th Cir. 2002), *cert. denied*, 537 U.S. 1124, 123 S. Ct. 863, 154 L. Ed. 2d 807 (2003) (declining to adopt a *per se* rule "to determine whether information possessed by one government entity should be imputed to another" but citing Antone with approval).

F.L. BAILEY AND K.J. FISHMAN, 1 COMPLETE MANUAL OF CRIMINAL FORMS § 14:10.50 (Jul. 2008).

insufficient evidence to impute knowledge from another district to the prosecutorial team in this district. And in an unrebutted affidavit Livingston swears that within hours of Coverley 's arrest he checked the DEA's database and discovered no Coverley-Major connection, so "there was no basis or reason for [Livingston] to make any further inquiry about Keith Major." Cr. doc. 170-2 at 2.[39] The Court thus **DENIES** Bowe's motion (doc. 12) for leave to serve the government with a Fed. R. Civ. P. 34 for production of the requested tapes.

---

[39] The Court also agrees with the government that Bowe can show no outcome-altering prejudice:

> It is inconceivable that this is the type of evidence which would have altered the jury's findings of guilt as to each count of the indictment. While the government does not contend that the evidence was known to the defendant before trial, or that it could have been discovered by due diligence (let us assume that Coverley never mentioned to Bowe that he was doing drug deals with Major, much as he did not mention to Major that Bowe was his financier), nonetheless the evidence could not be considered anything more than impeaching and certainly not such that it would "probably produce an acquittal." One can imagine the use that Bowe would have made of the Keith Major phone call at trial - counsel would ask Coverley why he did not mention Bowe to Major. A likely response of Coverley would have been "because there was no need to." A prosecutor's failure to disclose exculpatory evidence in response to a defense request amounts to constitutional error only if there is a reasonable probability that the evidence would have affected the outcome of trial. *See United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 3381-84 (1985). It is not reasonably probable that the information about Keith Major, submitted by Bowe in support of his motion, would have affected the outcome of trial.

Cr. doc. 170 at 17.

## III. CONCLUSION

Accordingly, the Court should **DENY** defendant Charles Alexander Bowe's 28 U.S.C. § 2255 motion. While Bowe's Fed. R. Cr. P. 33(b)(1) motion (Cr. doc. 165) is not before the undersigned, the district judge should, given the overlap of issues between Bowe's § 2255 and new-trial motions, apply the reasoning set forth *infra* in reaching it. Finally, the Court **DENIES** Bowe leave to amend his § 2255 motion (doc. 16), and also **DENIES** Bowe's motion (doc. 12) for leave to serve the government with a Fed. R. Civ. P. 34 request for production of the Coverley/Scott tapes.

**SO REPORTED AND RECOMMENDED** this 20th day of May, 2009.

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA